# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| **Plaintiff,** : | |
| : | **NO. 3 CR 19-208** |
| **v.** : | |
| : | |
| **WILLIAM L. COURTRIGHT** : | **JUDGE MANNION** |
| : | |
| **Defendant.** : | |

---

## DEFENDANT WILLIAM L. COURTRIGHT'S
## SENTENCING MEMORANDUM

---

### I.

William L. Courtright is a sixty- two (62) year old, lifelong Scranton resident, long-time Scranton businessowner, self-starter politician, accomplished martial arts teacher, and devoted father of three highly educated and successful adult children: William Courtright Esq., Dr. Patrick Courtright, Lindsey Jones; two grandsons, and one newborn granddaughter. Mr. Courtright is married to Mary Courtright. The couple has been married for thirty-seven (37) years. Additionally, Mr. Courtright enjoys a close and supportive relationship with his mother, Roseanne Courtright, age eighty-five (85), and his three (3) siblings, Charlotte Franco, age sixty-five (65); Robert Courtright age fifty-nine (59); and Barbara Shaughnessy age fifty-seven (57). Mrs. Shaughnessy, a technology manager for

1

the CIA praised her brother, describing him as a "good man of good character [who] did an amazing job raising his children."

In his early career, Mr. Courtright maintained modest managerial employment, and sole proprietorship of a karate school as well as a tactical defense and police instructor at Lackawanna Community College.[1] He then entered local government as a Scranton city councilman. Mr. Courtright successfully served as a Scranton city councilman for six (6) years.

During his tenure, Mr. Courtright became the first Scranton resident appointed to the Pennsylvania Municipal Police Officers Education and Training Commission. Thereafter, city council appointed Mr. Courtright as the chairman of public safety, upon which District Justice Kennedy remarked: "This is prestigious. And most law enforcement that I talk to and I talk to a lot of them, a lot of them are thrilled to have this guy in this position. It's a prestigious position." (Minutes Scranton City Council Meeting December 4, 2004).[2]

In 2006, Mr. Courtright became the Vice-President of city council continuing to serve as chairperson of public safety as well as chairperson of boards and commissions. In 2007, Mr. Courtright pushed city council to approve the purchase of additional police and detective vehicle/cruisers. Subsequently, after

---

[1] Mr. Courtright provided instruction to police officers in excess of twenty (20) years.
[2] http://www.scrantonpa.gov/council_agendas/12_02_04.html

serving exemplary terms, Mr. Courtright resigned as a city councilman in January 2010. Accordingly, Mr. Courtright sought the position of Scranton's tax collector. His campaign assured improvements in the single tax office. Scranton residents responded by electing Mr. Courtright as the city tax collector. He served as the city tax collector for four (4) years, managing a staff of eighteen (18) employees without incident. Under Mr. Courtright's oversight, the single tax office garnered additional revenue for the Scranton School District and the city's deficit through undisbursed funds. An audit performed in 2010 and completed in 2012 revealed "few flaws in office operations," with none of the flaws related to misstatements of financial information.[3]

In 2013, lauded for "moving the city forward," as the favored candidate of city workers and their families, city residents elected Mr. Courtright as the mayor of Scranton. Mr. Courtright entered office in January 2014 facing a $20 million deficit and $28 million in financing to pay a public safety arbitration award, and fund pension system increases.[4] In fact, when Mr. Courtright entered office, Scranton began fiscal year 2014 with a zero cash balance "creating significant operational strain," under the threat of default or bankruptcy.[5] Tasked with closing

---

[3] https://www.pressreader.com/usa/the-times-tribune/20130424/282711929520967
[4] http://www.thetimes-tribune.com/news/fresh-from-big-win-scranton-mayor-elect-bill-courtright-enters-transition-phase-1.1581721
[5] https://www.bondbuyer.com/news/moodys-scranton-pa-could-default

3

this $20 million deficit, and cooperating with the Pennsylvania Economy League as well as cooperating with city council, Mr. Courtright confronted the crisis, thwarted bankruptcy, and returned the city to stability.

Described as making "considerable progress," in the city, and becoming "the closest it's ever been to shedding," the "financially distressed" label, the Scranton Times-Tribune endorsed Mr. Courtright as "the better choice" in the 2017 election, citing Mr. Courtright's pay down of $40 million in debt.[6]

The Scranton Times-Tribune editorial board stated: "Courtright must be credited with taking a systematic, orderly approach to dealing with the difficult situation he inherited."[7] Local television news anchor and commentator, Andy Palumbo poignantly remarked: "my dealings with Bill Courtright were always professional, cordial [ . . . ] he was there when he needed to be [ . . . ] and the city didn't go bankrupt on his watch."[8]

Agreeing with the noticeable economic growth under the Courtright administration, city residents re-elected Mr. Courtright for a second term in 2017. During Mr. Courtright's second term, the composite pension fund, which was nearly broke in 2014 held assets worth $75 million with the potential to approach

---

[6] https://www.governing.com/topics/finance/gov-scranton-recovery-fiscally-distressed.html
[7] https://www.padems.com/scranton-times-tribune-courtright-mayor/

[8] http://andypalumbo.blogspot.com/2019/07/sad-and-angry.html

$100 million in 2018.[9]  With less pension debt, Mr. Courtright accomplished the ability to dedicate more money to other areas of the city's budget.  For example, seeking to reduce blight and encouraging development, Mr. Courtright initiated a neighborhood walk-thru with police officers and members of the licensing and inspection unit looking for blight issues, litter and any other code violations throughout the city's South Side, Hill Section, and West Side areas.  In an interview with Eyewitness News, Mr. Courtright acknowledged: "in the past there was grants for what they called 'saturation patrols' and those grants aren't around so we're taking it upon ourselves to do it ourselves to just make sure our neighborhoods are up to par." [10]

It is without question, Scranton improved politically and financially under Mr. Courtright's discretion, strategy, and charge.

Nevertheless, despite sustaining progress in an overall improved financial climate, and rendering innumerable nerve-racking decisions important to the city--- at what cost to Mr. Courtright's personal susceptibility and sensibility.

While combating the hefty challenges of a distressed city, Mr. Courtright feared financing re-election and maintaining a solid base of support.  In an attempt to build his personal and political network, situated inside a hotbed of political

---

[9] https://advisornews.com/oarticle/scranton-pensions-on-path-to-financial-recovery
[10] https://housingalliancepa.org/scranton-police-and-inspectors-hit-the-streets-in-the-fight-against-blight/

corruption, weakened by high-handed alliances, and persuaded by wealthy influentials, Mr. Courtright engaged in candid and casual quid pro quo conversations throughout his time in office resulting in a three (3) – count Information filed on July 1, 2019 for the following: conspiracy to (1) obstruct commerce by extortion through the wrongful use of fear of economic harm in violation of 18 U.S.C. § 1951(a); (2) obstruct commerce by extortion under color of official right in violation of 18 U.S.C. § 1951(a); (3) bribery concerning programs receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(B), occurring between February 1, 2014 and January 9, 2019 in violation of 18 U.S.C. § 371; attempt to obstruct commerce by extortion under color of official right on January 4, 2018, in violation of 18 U.S.C. 1951(a); and bribery concerning programs receiving federal funds on November 17, 2017 in violation of 18 U.S.C. § 666(a)(1)(B).

Within a day of the filing of the Information, Mr. Courtright immediately pled guilty pursuant to a plea agreement on July 2, 2019. Under the terms of the plea agreement, the Government agreed to recommend a three (3) –level decrease under the Sentencing Guidelines for acceptance of responsibility. Mr. Courtright agreed to the forfeiture of assets totaling $36, 705.00 as well as payment of restitution in full. Importantly, Mr. Courtright resigned from his position as mayor on July 1, 2019.

Accordingly, the presentence report places Mr. Courtright in criminal history category I, and assigned him a total offense level of forty (40). Based on these computations, the suggested guideline range for Mr. Courtright's offenses is two hundred and ninety-two (292) months- three hundred and sixty-five (365) months imprisonment, which is effectively a life sentence for a sixty-two (62) year old. Mr. Courtright submits that such a sentence would substantially exceed a "sufficient, but not greater than necessary," sentencing standard, and contradict the purposes of sentencing pursuant to 18 U.S.C. § 3553(a). As such, Mr. Courtright respectfully requests that this Court impose a below-guideline sentence.

## II.

Under the Sentencing Guidelines, a district court identifies the base offense level assigned to the crime in question, adjusts the level as the Guidelines instruct, and determines the defendant's criminal history category. *See* U.S.S.G. § 1B1.1. Coordinating the adjusted offense level and criminal history category yields the appropriate sentencing range. *Id.* Thus, at sentencing the district court must engage in a three (3) step inquiry. First, the district court must calculate the applicable guideline range. Second, the district court must determine basis for departure, and if departure is warranted, the affects of departure on Guideline calculation. Finally, after considering all factors in accordance with 18 U.S.C. § 3553(a), impose appropriate sentence, which may vary from the guideline range.

*See* <u>United States v. Levinson</u>, 543 F.3d 190, 195 (3d Cir. 2008)(*citing* <u>United States v. Wise</u>, 515 F.3d 207, 216-217(3d Cir. 2008)(citing <u>Gall v. United States</u>, 552 U.S. 38, 49, 128 S. Ct. 586, 596-597, 169 L.Ed. 2d 445 (2007) and <u>United States v. Gunter</u>, 462 F.3d 237, 247 (3d Cir. 2006)).

### <u>Guideline Calculation</u>

Mr. Courtright objects to the probation office's failure to deduct a total of three (3) levels for his timely acceptance of responsibility. *See* U.S.S.G. §§ 3E1.1(a) and (b). Furthermore, the written plea agreement in paragraph 11 refers to Mr. Courtright's acceptance of responsibility and states: "if the defendant can adequately demonstrate recognition and affirmative acceptance of responsibility to the Government, as requires by the Sentencing Guidelines, the Government *will recommend* that the defendant receive a three-level reduction in the defendant's offense level for acceptance of responsibility."

On July 1, 2019, the Government filed a three-count Information against Mr. Courtright, and within a day, Mr. Courtright timely appeared before the Honorable Chief Judge Christopher C. Conner to plead guilty to all three counts. In fact, paragraph 2 of the pre-sentence investigation report states: "pled guilty to all counts pursuant to a plea agreement whereby the government *will recommend* a three-level reduction for acceptance of responsibility."

During the pre-sentence interview, Mr. Courtright adopted the facts as placed on the record at the guilty plead hearing.

The application note under U.S.S.G. §§ 3E1.1 states:

> (A)truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct). Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility, but the fact that a defendant's challenge is unsuccessful does not necessarily establish that it was either a false denial or frivolous;
>
> (F)voluntary resignation from the office or position held during the commission of the offense;
>
> (H) the timeliness of the defendant's conduct in manifesting the acceptance of responsibility.

Mr. Courtright clearly demonstrated an acceptance of responsibility for his criminal conduct. He timely pled guilty within a day of the filing of an Information so as to avoid the Government preparing for trial and so as to allocate their resources efficiently. He resigned from office the same day that the Government filed an Information. He also agreed to forfeiture. Mr. Courtright

did not falsely deny any additional relevant conduct, nor did Mr. Courtright engage in any conduct inconsistent with such acceptance of responsibility. Mr. Courtright cooperated with the Government and did not provide any false statements. Mr. Courtright has shown contrition for the crime he has committed. Moreover, Mr. Courtright's initial objections to the pre-sentence investigative report did not vary significantly from the factual basis recited at his plea hearing and the conduct deemed admitted in the pre-sentence investigative report.

Mr. Courtright did not contest the facts of his conviction, only the legal significance of the amount of benefit received, and whether that amount triggered an applicable sentencing enhancement. Finally, Mr. Courtright's objections to the applicable sentencing enhancements were not false or frivolous.

### 18 U.S.C. § 3553(a) Factors

In the present matter, application of the statutory sentencing factors require a downward variance be granted, and that a guideline sentence is not necessary to satisfy the statutory objectives. A guideline sentence is overly punitive. This Court "shall impose a sentence sufficient, but not greater than necessary," to adhere to the purposes articulated in 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3553(a). To that end, a court's evaluation and application of section 3553(a) factors is accorded "high deference." *See* United States v. Bungar, 478 F.3d 540, 543 (3d Cir. 2007); United States v. Cooper, 437 F.3d 324, 330 (3d. Cir. 2006);

United States v. Tomko, 562 F.3d 558, 565 (3d Cir. 2009), *citing* United States v. Koon, 518 U.S. 81, 98, 116 S. Ct. 2035, 2045, 135 L.Ed. 2d 392 (1996)(recognizing the deference owed to a district judge who is in the best position to decide the issue in question). The court may depart from an otherwise applicable guideline range whenever the court finds "that there exists an aggravating or mitigating circumstances of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(b).

Moreover, imposition of sentence requires the court to act upon evidence that is logical and consistent with the factors set forth in section 3553(a). *See* Cooper, 437 F.3d at 330.

In the present case, the record "sufficiently supports the factual basis underlying [ . . . ] departure, and the degree of departure is reasonable." United States v. Koon, 518 U.S. 81, 98, 116 S. Ct. 2035, 2045, 135 L.Ed. 2d 392 (1996).

Having due regard for the purposes set forth in 18 U.S.C. § 3553(a), and for the relationship of the sentence imposed to sentences prescribed by the guidelines, applicable to similar offenses and offenders, and to the applicable policy statements of the Sentencing Commission, this Court is required to impose an appropriate sentence consistent with the following considerations. *See* 18 U.S.C. § 3553(a).

### a. The nature and circumstances of the offense and the history and characteristics of the Defendant.

As the Supreme Court reminds us, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." Koon, 518 U.S. at 113, 116 S.Ct. 2035.

Prior to being elected the mayor of Scranton, Mr. Courtright had no criminal history, and had always been gainfully employed in managerial positions. As a productive citizen, Mr. Courtright became the sole proprietor of Summit Karate earning his eighth degree in Tang Soo Do, which is a Korean martial art that places emphasis on mental and physical fitness. For over thirty-six (36) years, Mr. Courtright operated Summit Karate to train others in Tang Soo Do. Holding an eighth- degree black belt, which is one of the highest ranks in Tang Soo Do, Mr. Courtright became a grand master. Mr. Courtright continued to teach and mentor his students while training municipal police officers at Lackawanna Community College. Even as mayor, Mr. Courtright continued his involvement with the karate school. He became a positive influence to hundreds of students; youths and municipal police officers alike. At the beginning of his political career, Mr. Courtright helped the city to gain positive momentum as a city council member. He led the public safety commission and received an appointment to the

Pennsylvania Municipal Police Officers Education and Training Commission. In addition, while tax collector, Mr. Courtright supervised eighteen (18) employees and discovered additional unused revenue distributable to the city. In this role, Mr. Courtright maintained control over money and financial transactions without incident.

On this history alone, it is apparent that Mr. Courtright's conduct, which led to the Government's filing of an Information, represents a clear deviation from a law-abiding life.

In the present case, Mr. Courtright, admits to the conduct recited at the guilty plea hearing, and is remorseful for the casual and candid conversations that occurred. Mr. Courtright requests that this Court consider his offense conduct in relation to the $20 million dollar deficit and financial turmoil the city suffered, as well as the challenges he overcame to establish economic growth for the city.

Scranton's financial turmoil ripened a quid pro quo political culture, weakening Mr. Courtright's sensibilities. Notwithstanding, Mr. Courtright's history and characteristics reflect a sixty- two (62) year old, who has had no contact with the justice system and has demonstrated conduct otherwise exemplified by a modest upbringing, steady employment, solid ties to the community and law enforcement, professional accolades, and familial relationships. All of these factors are permissible departure factors and are

adequately supported in the record to justify a downward variance. Finally, since Mr. Courtright's guilty plea in 2019, he has maintained scrupulous compliance with the conditions of his release on personal recognizance.

### b. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

This Court has wide discretion to impose a sentence that is sufficient but not greater than necessary to effectuate the purposes of section 3553(a). *See* United States v. Booker, 543 U.S. 220, 125 S. Ct. 738, 160 L.Ed. 2d 621 (2005). A sentencing court may grant a variance where the defendant's crime is based upon aberrant conduct in an otherwise upstanding life. *See* United States v. Howe, 543 F.3d 128, 132-4 (3d. Cir. 2008); *See also* United States v. Tomko, 562 F.3d 558, 571 (3d. Cir. 2010)(affirming district court's variance that took into account defendant's negligible criminal history, employment record, community ties, and extensive charitable works).

In the present case, Mr. Courtright requests downward departure because the benefit received overstates Mr. Courtright's criminality. A sentence within the guideline range is not necessary to accomplish statutory objectives. Such a sentence is effectively a life sentence. Mr. Courtright submits that his conduct as recited at the guilty plea hearing does not involve such a complex scheme of scenarios as observed in United States v. Spencer, and United States v. Pawlowski.

In Spencer, the Government proved three distinct schemes, with overt acts that included overruling decisions by evaluation committees, manipulating the bidding processes, assisting with underbidding competitors, and devising and ensuring the repeal of a code of ethics section. A jury convicted the former mayor of nine (9) counts of bribery, and one (1) count of wire fraud, and one (1) count of conspiracy. The court sentenced the former mayor to eight (8) years.

Moreover in Pawlowski, the mayor of Pennsylvania's third-most populous city, the Government proved on an even larger scale, at least forty offenses which included overt acts of (1) steering five different contracts worth millions and thousands to specific companies; (2) soliciting bribes for favorable intervention in at least ten (10) different contracts or private ventures; and (3) rigging the contracting process and victimizing businesses who competed fairly. Over the course of a six (6) week trial, the Government proved at least eight (8) different schemes with pending contracts and/or commencing wholly unnecessary contracts, manipulating zoning uses, utilizing "burner" cell-phones for concealment, wiping electronic devices, overruling the city's contracting and engineer staff to award contracts, and outsourcing the city's contracting to political operatives.

All schemes that evidenced the mayor as an unabashed, self-serving mastermind and ambitious manipulator, who planned to become a U.S. Senator by 2016. Moreover, the schemes involved several other officials who were either

convicted as co-conspirators or entered into agreements. The former mayor shifted the blame for his misconduct, citing that he was not aware his campaign staffers and city employees were involved in a pay to play scheme. Pawlowski made breaking the law a standard operating procedure. He became sophisticated in concealment, having his office swept for listening devices, having his electronic devices wiped, and writing dollar figures on paper to hand to vendors to prevent recordings, conversing with co-conspirators outdoors and in elevators.

Ultimately, the court sentenced the former mayor to fifteen (15) years, which is considerably less compared to the instant overstated guideline sentence of two-hundred and ninety (292) – three hundred and sixty-five (365) months in the present case.

The Government described the impact of Pawlowski's actions as "widespread." Mr. Courtright's actions can hardly be described as having a widespread. Here, Mr. Courtright primarily engaged in one scheme accepting quid pro quo cash exchanges from John P. Rodgers, president of Northeast Revenue Services. Mr. Courtright engaged in quid pro quo cash exchanges directly and indirectly to maintain an ongoing contract that begin years before Mr. Courtright entered office. [11] For obvious reasons, the contract endured. Additionally, Mr.

---

[11] Distinctly, Pawlowski, solicited bribes from Northeast Revenue while a request for proposals (RFP) was pending for the delinquent real estate tax contract. On December 18, 2013, the mayor directed Sean Kilkenny, a representative of

Courtright engaged in conduct wherein he received lawn care, home repairs, and renovations at his karate school as quid pro quo exchanges for favorable licensing actions in a pending development project. Lastly, Mr. Courtright temporarily halted licensing actions on a private development project seeking a quid pro quo cash exchange.

This conduct does not rise to the level of the intricate, pervasive, and obstructive schemes utilized by <u>Spencer</u> or <u>Pawlowski</u> nor is Mr. Courtright singularly the mastermind behind the quid pro quo schemes. Mr. Courtright's conduct is distinguishable and lacks the pervasiveness and breadth of <u>Spencer</u>, and <u>Pawlowski</u>. Both cases proceeded to lengthy jury trials wherein the Government proved that the former mayors frustrated and manipulated the "contracting process."

Mr. Courtright did not manipulate or rig bids, he did not override or overrule city engineering staff to award contracts, he did not manipulate zoning use, did not seek the repeal of an ethics code nor did he utilize a burner cell-phone to carry out his conduct. Mr. Courtright did not misuse city funds to line his pockets or his

---

Northeast Revenue to make a $25,000 campaign contribution. The mayor also solicited Philadelphia Eagles playoff game tickets, from Northeast Revenue as well as a Del Frisco's Steakhouse meal. After receiving both the tickets and the meal, the mayor directed the city's finance director to ensure that the contract be awarded to Northeast Revenue, ignoring all qualifications and evaluation procedures outlined in Allentown's RFP process, and defrauding two other competitors Lindebarger Goggin and Portnoff Law Associates by rigging the process.

family. Also, Mr. Courtright did not involve other officials in his actions. Mr. Courtright did not seek tickets to exclusive sporting events or lavish dinners.

Unlike Pawlowski, Mr. Courtright admitted responsibility and did not shift the blame on his employees or staffers. Pawlowski sold his influence for greed, whereas Mr. Courtright sought influence. Mr. Courtright allowed himself to succumb to that end, albeit an improper avenue- consigning with high-handed alliances for influence. Finally, Mr. Courtright did not seek to thwart investigation or prosecution like Pawlowski.

Ultimately, Mr. Courtright has no prior criminal record or substance abuse problems, he does not present a danger to the public, he is not likely to reoffend, has strong family support as well as a solid employment history, and this resonates with a sentence less than the guideline range coupled with the imposition of substantial restitution and a fine. At the very least, resonates with a sentence less than the fifteen (15) year sentence imposed in Pawlowski.

### c. The need for the sentence imposed to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the Defendant.

Mr. Courtright is particularly deterred by the consequences of his actions. The collateral consequences of Mr. Courtright's prosecution and conviction include: over one (1) year of legal proceedings, legal fees, personal financial loss, the loss of his proprietorship, the loss of elected office, public shame, humiliation,

loss of standing within the community as well as the above-cited criminal convictions that will follow Mr. Courtright for the rest of his life. Most importantly, Mr. Courtright will forfeit assets as set forth in the Forfeiture allegation of the Information.

Further, as a result of Mr. Courtright's actions, his family suffers financial and emotional hardship. He is involved in his children's lives as well as his grandchildren's lives. A long term of incarceration would be a life sentence and cause extreme hardship to his family unit.

**d. The need for the sentence imposed to provide the Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

Mr. Courtright respectfully submits that he does not require additional educational or vocational training, medical care, or other vocational treatment. Mr. Courtright held several managerial positions as well as sole proprietor of his karate school, Summit Karate.

Medically, Mr. Courtright occasionally suffers gout and is prescribed Celebrex. He ingests a low dose of aspirin daily.

Mr. Courtright does not suffer from any mental health diagnoses. As result, Mr. Courtright does not require treatment.

Mr. Courtright does not consume illicit drugs and does not require treatment. On July 2, 2019 Mr. Courtright submitted a negative drug screen.

**e. The need for the sentence imposed to consider the kinds of sentences available, the sentencing range established by the properly calculated Guidelines, and to avoid unwarranted sentencing disparities.**

In July 2019, the Government filed a three (3) – count Information against

Mr. Courtright for Conspiracy: (1) Obstruct Commerce by Extortion Through the

Wrongful Use of Fear and Economic Harm; (2) Obstruct Commerce by Extortion

Under Color of Official Right, and (3) Bribery Concerning Programs Receiving

Federal Funds in violation of 18 U.S.C. § 371, Attempt to Obstruct Commerce by

Extortion Under Color of Official Right, in violation of 18 U.S.C. § 1951(a), and

Bribery Concerning Programs Receiving Federal Funds in violation of 18 U.S.C. §

666(a)(1)(B). Mr. Courtright pled guilty to the Information pursuant to a written

plea agreement on July 2, 2019. Accordingly, on Count I: Conspiracy, 18 U.S.C. §

371, the statutory maximum is five (5) years imprisonment and a $250,000 fine;

Count II: Attempt to Obstruct by Extortion Under Color of Official Right, 18

U.S.C. § 1951(a), the statutory maximum is twenty (20) years imprisonment and a

$250,000 fine; Count III: Bribery Concerning Programs Receiving Federal Funds,

18 U.S.C. § 666(a(1)(B), the statutory maximum is ten (10) years imprisonment

and a $250,000 fine.

With regards to the applicable Guideline range, Mr. Courtright's offense

level was computed with the 2018 Guidelines Manual. Because Mr. Courtright

objects to the probation office's failure to include a three (3) level deduction, the

precise level remains unresolved. Nonetheless, without reference to Mr. Courtright's objection argued above, the base total offense level listed in the presentence report is forty (40). Mr. Courtright's criminal history category is I and thus the applicable Guideline imprisonment range is two hundred and ninety-two (292) months – three hundred and sixty- five (365) months imprisonment, effectively a life sentence.

This Court should consider that the Guidelines overstate Mr. Courtright's conduct. As explained above, Mr. Courtright's case does not involve the breadth of schemes observed in <u>Spencer</u> and <u>Pawlowski</u>. Importantly, Mr. Courtright made the necessary adjustments to avoid bankruptcy for Scranton. Mr. Courtright immediately admitted guilt and did not proceed to a lengthy trial as in <u>Spencer</u> or <u>Pawlowski</u>. Notably, Mr. Courtright acknowledged responsibility and did not blame others for his actions.

Mr. Courtright's underlying conduct when viewed alongside that usually prosecuted under each statute and when viewed alongside the context of the financially distressed city does not warrant a guideline sentence. Charged with leading the city out of financial crisis, Mr. Courtright economically enhanced and sustained the city with $20 million in deficit bringing tremendous change and benefit to the Scranton area. Unlike the cities in <u>Spencer</u> and <u>Pawlowski</u>, Scranton improved significantly. Mr. Courtright committed the offenses amidst financial

tension weakened by the magnitude of his obligations in office. This reduced

rational capacity coupled with high-handed alliances contributed substantially to

the commission of the offenses. Mr. Courtright did not selfishly enrich his personal

lifestyle. He resides in the same residence for twenty- seven (27) years. Mr.

Courtright did not vacation lavishly or attend exclusive sporting events and

expensive dinners as observed in <u>Spencer</u> and <u>Pawlowski</u>. Mr. Courtright had no

coconspirators. Mr. Courtright's sentence should be commensurate to his conduct,

which is not equal to the extent or egregiousness of other corrupt mayor cases, and

at the very least warrants a sentence less than fifteen (15) years. Mr. Courtright

respectfully requests that this Court account for several important considerations

distinguishing one defendant from another under the guidelines, such as number of

bribes, disruption of governmental function and the nature of the conduct as a

metric to impose an appropriate sentence. *See* <u>United States v. Parker</u>, 462 F.3d

273 (3d. Cir. 2006)(the court should ensure sentencing consistency). Simply put,

Mr. Courtright's conduct is less extensive than <u>Pawlowski</u>, and devoid of any

obstructive qualities. Mr. Courtright did not disrupt an entire city process or

corrode all city functions.

WHEREFORE, pursuant to the United States Sentencing Guidelines and 18

U.S.C. § 3553(a), under the circumstances of this case, Mr. Courtright respectfully

requests this Court to issue a sentence cognizant of the foregoing and permit a

reasonable downward departure, as the guideline range is a life sentence and

represents an unwise sentencing policy.

Respectfully submitted,


_____
PAUL J. WALKER, ESQ.
204 Wyoming Avenue
Scranton, PA 18503

**ATTORNEY FOR DEFENDANT,
WILLIAM L. COURTRIGHT**

DATE: _____

## <u>CERTIFICATE OF SERVICE</u>

I,_____, HEREBY certify that a true and

correct copy of the foregoing Sentencing Memorandum was served upon the

following counsel and the United States Probation Office by hand delivery on this

_____ day of _____, 2020.


Michelle Olshefski
United States Attorney's Office
William J. Nealon Federal Building
P.O. Box 309
235 North Washington Avenue
Scranton, PA 18501

Michael A. Consiglio
United States Attorney's Office
Federal Building, Suite 220
228 Walnut Street
Harrisburg, PA 17108


_____
PAUL J. WALKER, ESQUIRE
204 Wyoming Avenue
Scranton, PA 18503